## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SUSAN FREDERICKS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 20-cv-2458 (KBJ) |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| THE INTERIOR, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

John Fredericks, Jr., an enrolled member of the Three Affiliated Tribes of North

Dakota, passed away in December of 2006. (Compl., ECF No. 1, ¶¶ 14, 18.) From that

point until now, five of John's children (collectively, "Plaintiffs") have been engaged in

litigation with the Department of the Interior ("DOI") regarding the disposition and use

of 3,477 acres of land in the Fort Berthold Indian Reservation in North Dakota that the

United States had been holding in trust for their father, pursuant to an 1886 agreement

between the United States and the Three Affiliated Tribes. (*See id.* ¶¶ 1, 20.) As

relevant here, in 2008, the Acting Superintendent of the Fort Berthold Agency executed

a lease that permits oil and gas development on a parcel of those trust lands. (*See id.*

¶ 28.) Plaintiffs subsequently asked the DOI to declare that lease invalid, and to

distribute the existing lease proceeds to Plaintiffs rather than to Judy Fredericks, John's

surviving spouse. (*See id.* ¶ 35.) The DOI evaluated this request, and determined that

the lease was validly executed under the Fort Berthold Mineral Leasing Act

("FBMLA"), Pub. L. No. 105-188, 112 Stat. 620 (1998) (codified as amended at 25

U.S.C. § 396 note), and that, given the terms of the American Indian Probate Reform Act of 2004 ("AIPRA"), Pub. L. No. 108-374, 118 Stat. 1773 (codified as amended at 25 U.S.C. § 2201 *et seq.*), Judy is entitled to all of the income generated from the lease for the remainder of her lifetime. (*See* Compl. ¶¶ 43–49.) Plaintiffs then filed the instant lawsuit, claiming that the DOI's conclusions violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and seeking judicial review. (*See* Compl. ¶ 3.)

Before this Court at present is a motion for a preliminary injunction that Plaintiffs have filed; they seek an interim order that enjoins the DOI from distributing any proceeds of the oil lease to Judy until the Court resolves this legal dispute. (*See* Pls.' Mot. for Entry of Prelim. Inj., ECF No. 4, at 1.)[1] Plaintiffs contend that (1) they are likely to succeed on the merits of their challenges to the DOI's decision (*see* Pls.' Mem. in Supp. of Mot. for Prelim. Inj. ("Pls.' Mot."), ECF No. 4-1, at 10); (2) distribution of the lease proceeds would cause them irreparable harm (*see id.* at 20); and (3) the balance of equities and the public interest favor issuance of preliminary injunctive relief (*see id.* at 23). The DOI disputes each of these contentions (*see* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. ("Defs.' Opp'n"), ECF No. 11, at 20), and for the reasons explained below, this Court concludes that, at least based on the parties' arguments for and against preliminary injunctive relief, Plaintiffs have not established a likelihood of success on the merits of their claims. The Court also finds that Plaintiffs have not proven that their alleged harms are irreparable, nor have Plaintiffs shown that

---

[1] Page-number citations to the documents that the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

the balance of the equities or the public's interest support the requested preliminary relief.

Accordingly, Plaintiffs' motion for a preliminary injunction will be **DENIED**. A separate Order consistent with this Memorandum Opinion will follow.

## I.    BACKGROUND

### A.    Statutory and Regulatory Framework

In the late 1800s, Congress allotted parcels of land within the Fort Berthold Reservation to individual members of the Three Affiliated Tribes. *See* Agreement at Fort Berthold art. III (Dec. 14, 1886), ch. 543, § 23, 26 Stat. 1032, 1033 (1891); *see also Fort Berthold Rsrv. v. United States*, 390 F.2d 686, 689 (Ct. Cl. 1968). Notably, these allotments were not grants of title to the land in fee simple; rather, the federal government held legal title to the lands in trust, and pledged to manage them for the benefit of the Indian allottees, who have a beneficial interest in the lands. *See* Agreement at Fort Berthold art. IV; *cf. Cobell v. Norton*, 240 F.3d 1081, 1087 (D.C. Cir. 2001). "As a result of [the] allotment, individual Indians became beneficiaries of the trust lands, but lost the right to sell, lease, or burden the property without the federal government's approval." *Cobell*, 240 F.3d at 1088. Thus, the federal government "probates estates related to Indian trust lands[,]" and it "receives and distributes income from the lease of allotted lands" to the individual beneficiaries of those lands. *Id.*

Consistent with the federal government's obligation to manage Indian lands in this way, Congress has enacted a number of statutes governing leasing on Indian lands and the probate of Indian estates, and the DOI is charged with administering those

statutes.  *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 166 (2011).  The instant matter implicates two of these statutes, both of which are described briefly below.

1.    The Fort Berthold Mineral Leasing Act

Congress enacted the FBMLA in 1998 "to amend the Mineral Leasing Act of 1909," which is codified at 25 U.S.C. § 396.[2]  The FBMLA was designed "to facilitate the leasing of mineral rights within the exterior boundaries of the reservation of the Three Affiliated Tribes of the Fort Berthold Reservation[,]" S. Rep. No. 105-205, at 1 (1998), which had otherwise encountered significant obstacles, including "too many mineral interests tied up in probate[,]" *id.* at 3.  For example, the Mineral Leasing Act had been interpreted to require that "all persons who have an undivided interest in any particular parcel must consent to its lease," but, due to "fractionated heirship[,]" there could be "hundreds of owners of an undivided interest in a parcel of land."  *Id.* at 3–4.  The FBMLA sought to address this and other problems by "permit[ting] mineral leasing of Indian land located within the Fort Berthold Indian Reservation in any case in which there is consent from a majority interest in the parcel of land under consideration for lease."  Pub. L. No. 105-188, 112 Stat. at 620.

---

[2] The FBMLA is codified in the statutory notes to section 396 of Title 25 of the United States Code under the heading "Leases of Certain Allotted Lands[,]" 25 U.S.C. § 396 note, and has been amended by subsequent legislation that extends the Act's coverage to certain Indian lands outside the Fort Berthold Reservation. *See* Mineral Leasing of Certain Indian Lands, Pub. L. No. 106-67, § 1(2), 113 Stat. 979, 979 (1999).  The parties have not suggested that the amendment, or the fact that the FBMLA appears in a statutory note, has any bearing on the instant disputes.  *See Nat'l Veterans Legal Servs. Program v. United States*, 968 F.3d 1340, 1343 n.1 (Fed. Cir. 2020) ("That this text appears as a statutory note, rather than as section text, is of no moment." (internal quotation marks and citation omitted)).  Consistent with the parties' filings and the relevant agency decisions, this Memorandum Opinion generally cites the FBMLA's provisions as they appear in the Act as it was originally enacted.

The FBMLA begins by defining "Indian land" as "an undivided interest in a single parcel of land" that "is located within the Fort Berthold Indian Reservation in North Dakota" and "is held in trust or restricted status by the United States." FBMLA § 1(a)(1)(A).[3] It also defines "individually owned Indian land" as "Indian land that is owned by 1 or more individuals." *Id.* § 1(a)(1)(B).

The statute goes on to describe the circumstances in which the Secretary of the Interior may "approve any mineral lease or agreement that affects individually owned Indian land." *Id.* § 1(a)(2)(A). In this regard, the statute sets out two prerequisites for the Secretary's approval of a lease: (1) "the owners of a majority of the undivided interest in the Indian land that is the subject of the mineral lease or agreement" must "consent to the lease or agreement[,]" and (2) the Secretary must "determine[] that approving the lease or agreement is in the best interest of the Indian owners of the Indian land." *Id.* And to determine "the best interest of the Indian mineral owner[,]" the regulations governing leasing of Indian lands require the Secretary to consider "any relevant factor, including, but not limited to: economic considerations, such as date of lease expiration; probable financial effect on the Indian mineral owner; leasability of land concerned; need for change in the terms of the existing lease; marketability; and potential environmental, social, and cultural effects." 25 C.F.R. § 212.3; *see also* S. Rep. No. 105-205, at 6 (explaining that these factors would govern the best-interest determination under the FBMLA).

---

[3] An "undivided interest" refers to "[a]n interest held under the same title by two or more persons, whether their rights are equal or unequal in value or quantity." *Interest*, Black's Law Dictionary (11th ed. 2019). In the case of real property such as land, it means that no single interest holder owns a specific piece of the property, and thus all interest holders share the entire property.

Notably, per the text of the FBMLA, the effect of the Secretary's approval is that "the lease or agreement shall be binding, to the same extent as if all of the Indian owners of the Indian land involved had consented to the lease or agreement, upon . . . all owners of the undivided interest in the Indian land subject to the lease or agreement" and "all other parties to the lease or agreement."  FBMLA § 1(a)(2)(B).  The statute also provides that "[t]he proceeds derived from a lease or agreement that is approved by the Secretary . . . shall be distributed to all owners of the Indian land that is subject to the lease or agreement in accordance with the interest owned by each such owner."  *Id.* § 1(a)(2)(C).  The FBMLA further authorizes the Secretary to execute—not merely approve—"a mineral lease or agreement that affects individually owned Indian land on behalf of an Indian owner" in certain circumstances.  *Id.* § 1(a)(3).  As relevant here, the Secretary may execute such a lease if the "owner is deceased and the heirs to, or devisees of, the interest of the deceased owner have not been determined."  *Id.* § 1(a)(3)(A).

### 2.    The American Indian Probate Reform Act

The AIPRA was enacted "to address the ever-worsening administrative and economic problems associated with the phenomenon of fractionated ownership of Indian lands."  S. Rep. No. 108-264, at 1 (2004).  Congress found, *inter alia*, that "the reliance of the Federal Government on the State law of intestate succession with respect to the descent of allotments has resulted in numerous problems affecting Indian tribes," including "the increasingly fractionated ownership of trust and restricted lands as that land is inherited by successive generations of owners as tenants in common."  Pub. L. No. 108-374, § 2(3)(A), 118 Stat. at 1773.  Accordingly, the AIPRA amended the Indian Land Consolidation Act, codified at 25 U.S.C. § 2201 *et seq.*, to create "a new,

uniform federal probate code applicable to" Indian lands, as well as "mechanisms for the Department of the Interior, tribes[,] and individual Indians to consolidate[] highly fractionated Indian lands." H.R. Rep. No. 108-656, at 1 (2004).

The provisions of the AIPRA that are relevant here are those governing "nontestamentary disposition"—*i.e.*, the descent of property "that is not disposed of by a valid will[.]" 25 U.S.C. § 2206(a)(1). The AIPRA specifically provides that, where a tribal probate code does not apply, *see id.* § 2206(a)(1)(B), "[i]f there is a surviving spouse of the decedent" and "the decedent is survived by 1 or more eligible heirs[,]" the surviving spouse "shall receive 1/3 of the trust personalty of the decedent *and a life estate without regard to waste* in the interests in trust or restricted lands of the decedent[,]" *id.* § 2206(a)(2)(A)(i) (emphasis added). Moreover, in such a case, "[t]he remainder shall pass" to "those of the decedent's children who are eligible heirs . . . in equal shares." *Id.* § 2206(a)(2)(A)(iii), (B)(i). The AIPRA defines "eligible heirs" for purposes of section 2206 to include "any of a decedent's children, grandchildren, great grandchildren, full siblings, half siblings by blood, and parents who are" Indian or "lineal descendents within 2 degrees of consanguinity of an Indian[.]" *Id.* § 2201(9). And, critically, with respect to a "life estate interest in land," the AIPRA defines "without regard to waste" to mean "that the holder of such estate is entitled to the receipt of all income, including bonuses and royalties, from such land *to the exclusion of the remaindermen*." *Id.* § 2201(10) (emphasis added).[4]

---

[4] A "life estate" refers to "an interest in property held only for the duration of the designated person's life." *See* 25 C.F.R. § 179.2. Upon the life estate holder's death, the life estate terminates, and the property interest passes to the "remaindermen" rather than becoming part of the life estate holder's probate estate. *See id.* § 179.4.

The AIPRA's treatment of "life estate[s] without regard to waste[,]" 25 U.S.C. § 2206(a)(2)(A)(i), is further addressed in regulations that the Bureau of Indian Affairs ("the Bureau")—an agency within the DOI—has promulgated to "govern[] the administration of life estates and future interests in trust and restricted property by the Secretary of Interior[,]" 25 C.F.R. § 179.1. Prior to the AIPRA's enactment, the Bureau's regulations had "required all life tenants to ensure that they did not diminish the estates of the remaindermen in their pursuit of rents and profits." Indian Trust Management Reform, 73 Fed. Reg. 67,256, 67,272 (Nov. 13, 2008); *see also Fredericks v. United States*, 125 Fed. Cl. 404, 415 (2016) (explaining that, before the amendment, "a life tenant would be paid interest on the proceeds from a mineral lease, with the principal, *i.e.*, the proceeds themselves, going to the remaindermen"). The Bureau recognized that the AIPRA necessitated changes to its regulations in order "to reflect the AIPRA sections establishing that life estates created by operation of law under [the] AIPRA will be determined 'without regard to waste,' meaning that the life estate holder is entitled to the receipt of all income, including bonuses and royalties, from such land, to the exclusion of remaindermen." 73 Fed. Reg. at 67,272.

Accordingly, like the AIPRA, the Bureau's regulations define "life estate without regard to waste" to mean "that the holder of the life estate interest in land is entitled to the receipt of all income, including bonuses and royalties, from such land to the exclusion of the remaindermen." 25 C.F.R. § 179.2. The regulations further provide that, for life estates created under the AIPRA, "[t]he Secretary must distribute all income, including bonuses and royalties, to the life estate holder to the exclusion of any holders of remainder interests." *Id.* § 179.201. And "[t]he holder of a life estate

without regard to waste may cause lawful depletion or benefit from the lawful depletion of the resources[,]" but "may not cause or allow damage to the trust property through culpable negligence or an affirmative act of malicious destruction that causes damage to the prejudice of the holders of remainder interests." *Id.* § 179.202.

In addition to establishing the probate scheme described above, the AIPRA also authorizes the Secretary of the Interior to approve leases of individually owned Indian land. *See* 25 U.S.C. § 2218(a)(1). However, the statute clarifies that "[n]othing in this chapter shall be construed to supersede, repeal, or modify any general or specific statute authorizing the grant or approval of any type of land use transaction involving fractional interests in trust or restricted land." *Id.* § 2218(g). And the AIPRA further specifically references the FBMLA, when it provides that "[n]othing in this section shall be construed to amend or modify the provisions of Public Law 105-188"—*i.e.*, the FBMLA—"or any other Act that provides specific standards for the percentage of ownership interest that must approve a lease or agreement on a specific reservation." *Id.* § 2218(f).

### B.      Factual Background

#### 1.      Probate Proceedings

John Fredericks, Jr. died intestate (without a will) on December 27, 2006 (Compl. ¶ 14), and was survived by his wife Judy and seven children, each of whom qualifies as an eligible heir under the AIPRA with respect to the 3,477 acres of land on the Fort Berthold Reservation that the United States was holding in trust for John (*see*

*id.* ¶¶ 18–20).[5]  The Bureau initiated proceedings to probate John's trust assets in 2007. (*See* Decl. of John Fredericks III ("Fredericks Decl."), ECF No. 4-2, ¶ 4.)

On June 20, 2009, an Indian Probate Judge held that (1) Judy had a life estate without regard to waste under the AIPRA in certain of John's trust lands, and (2) the seven Fredericks children who were deemed eligible heirs under the AIPRA each owned a 1/7th share of those trust lands as remaindermen. *Estate of John Fredericks, Jr.*, 57 IBIA 204, 205–06 (2013) ("*Probate Decision*").  The Probate Judge observed that Judy's "life estate without regard to waste meant that she may cause minerals to be depleted from the properties subject to her life estate to the exclusion of the remaindermen," and that she would "receive all royalties and/or income generated from those properties."  *Id.* at 206 (internal quotation marks, citations, and alterations omitted); *see also id.* (noting Probate Judge's conclusion that "mineral interests held in trust are subject to AIPRA").

After the probation decision issued, Plaintiffs filed a petition for rehearing, which an Administrative Law Judge ("ALJ") denied on May 31, 2011.  *See id.* at 207. Plaintiffs then appealed to the Interior Board of Indian Appeals ("Board"), which affirmed the ALJ's order denying rehearing on July 11, 2013.  *See id.* at 205.[6]

---

[5] The plaintiffs here are the five children from John's previous marriage to Candace Bridges (Compl. ¶¶ 15–16), and the two children he had with Judy were also deemed eligible heirs (*id.* ¶ 17).  John had a total of nine children, but two were adopted by other families and thus were determined not to be eligible heirs under AIPRA.  *See Probate Decision*, 57 IBIA at 205 n.5 (citing 25 U.S.C. § 2206(j)(2)(B)(iii)).

[6] The Board also concluded that it lacked jurisdiction to address certain other arguments that Plaintiffs had raised during the probate proceedings, including Plaintiffs' assertion that AIPRA is unconstitutional, *see Probate Decision*, 57 IBIA at 210, and it rejected other arguments on the merits, such as Plaintiffs' contention that the AIPRA did not apply to John's probate because the statute's implementing regulations were not yet in effect at the time of John's death, *see id.* at 210–11. Plaintiffs have not renewed any of these challenges in the instant action.  (*See* Compl. ¶¶ 88–95, 102–07.)

Plaintiffs did not seek judicial review of the Board's decision, so the probate decision became final on July 11, 2013.  (*See* Compl. ¶ 26.)

## 2.   Oil and Gas Lease Proceedings

Meanwhile, on February 4, 2008—after John's death, but before the first decision in the probate proceedings—Kodiak Oil & Gas entered into a lease to mine oil and natural gas on a 160-acre allotment of John's trust lands.  (*See* Ex. C to Compl. ("Oil and Gas Lease"), ECF No. 1-3, at 2.)  The parties to the lease were listed as Kodiak Oil & Gas and the "Heir(s) of Allotment 1029A-A, The Estate of John Fredericks Jr." (*id.*), and Judy signed the lease on behalf of the "Estate of John Fredericks, Jr." (*id.* at 5).  The lease specified that payment would consist of a $300 bonus, a rental of $2.50 per acre per year, and an 18% royalty on the value of all oil and gas produced on the allotment.  (*Id.* at 2.)  The written lease agreement further provided that "[a]ll rental and royalty payments . . . shall be made . . . to the payee designated by the Area Director."  (*Id.* at 3; *cf.* Compl. ¶ 35 n.2 (alleging that the royalties from this particular lease were deposited into an Individual Indian Money account for John's estate, where "funds are held until the Department directs their disbursement in accordance with the determinations of the" Probate Judge and the Board).)  The Oil and Gas Lease had a five-year initial term, and then was to continue "as much longer thereafter as oil and/or gas is produced in paying quantities from said land."  (Oil and Gas Lease at 2.)

Several months later, on April 23, 2008, the Acting Superintendent of the Fort Berthold Agency signed the "Approved" line on the Oil and Gas Lease document.  (*Id.*

at 5.)[7]  That same day, the Superintendent, on behalf of "John Fredericks Jr. (Estate)[,]"

also signed a separate form titled "Acceptance of Lessor to be Attached to Oil and Gas

Mining Lease[.]"  (*See* Ex. D to Compl. ("Acceptance of Lessor"), ECF No. 1-4, at 2.)

The form stated: "The undersigned hereby accepts the bonus, in the amount of

$300/acre or their proportionate share thereof, offered by" Kodiak Oil & Gas "for an

Oil and Gas Lease on the land described below, . . . subject to all of the conditions

contained in the standard Oil & Gas Lease form, approved by the Commissioner of

Indian Affairs, . . . and to be effective upon the approval thereof by the Secretary of the

Interior or his authorized representative."  (*Id.*)  The form also specified that "[t]he

undersigned further agrees that this acceptance shall be attached to the formal lease

contract, when signed by the lessee, and become a part thereof, with the same effect and

in lieu of my signature thereon."  (*Id.*)  Beneath the Superintendent's signature was the

following text: "Signed by Superintendent IAW 25 CFR 212.21(a)(b)(c)[.]"  (*Id.*)

Plaintiffs maintain that they first learned of the Oil and Gas Lease in March of

2013, five years after its execution, during the pendency of the Board appeal in the

probate proceedings.  (Fredericks Decl. ¶ 8.)  On July 23, 2013, less than two weeks

after the Board issued its decision, Plaintiffs submitted a request to the Bureau's

Regional Director for the area that includes the Fort Berthold Reservation, seeking a

declaration that the Oil and Gas Lease is invalid, and requesting both segregation of the

lease proceeds and distribution of those proceeds to Plaintiffs.  (Compl. ¶ 35.)[8]  For the

---

[7] The Interior Secretary's authority to execute and approve certain mineral leases on the Fort Berthold Reservation has been delegated to the Superintendent of the Fort Berthold Agency.  (*See* Oil and Gas Lease at 5 (citing various agency manuals).)

[8] Plaintiffs submitted a similar request to the Board during the probate proceedings.  *See Probate Decision*, 57 IBIA at 209 n.13.  The Board declined to address the validity of the Oil and Gas Lease or the distribution of the lease proceeds in the context of that proceeding, concluding that Plaintiffs'

reasons explained more fully below, the Regional Director denied Plaintiffs' request on

February 15, 2017. (*See* Ex. E to Compl. ("Regional Director Decision"), ECF No. 1-5,

at 2, 5.) Plaintiffs appealed this determination to the Board, and in the decision that is

the subject of the instant legal action, the Board affirmed on August 4, 2020. *See*

*Fredericks v. Great Plains Reg'l Dir.*, 67 IBIA 130, 149 (2020) ("*Board Decision*").

Throughout the agency proceedings concerning the Oil and Gas Lease, Plaintiffs

made essentially two sets of arguments, which track their contentions in this lawsuit.

First, Plaintiffs asserted that the lease was invalid because it was not properly

"execute[d]" pursuant to section 1(a)(3) of the FBMLA, given that Judy executed the

lease rather than the Secretary or the Superintendent. (*See* Regional Director Decision

at 12.) The Regional Director rejected this argument, explaining that, "[a]lthough Judy

Fredericks signed the fourth page of the Lease as the lessor, it was actually the Acting

Superintendent that granted consent to the Lease" by signing the Acceptance of Lessor

form. (*Id.* at 3.) The Regional Director also observed that this form was "commonly

utilized to document consent for oil and gas leases on the Fort Berthold Indian

Reservation" (*id.*); therefore, in the Director's view, "the intent of the Acting

Superintendent's execution of the Acceptance of Lessor Form" was to execute the lease

itself (*id.* at 4), rendering "the Acting Superintendent's April 23, 2008 consent and

approval of" the Oil and Gas Lease "proper" for statutory purposes (*id.* at 5). On

appeal of the Regional Director's decision, the Board agreed that the Oil and Gas Lease

was properly executed, concluding that "[t]he Regional Director's finding that the

---

request was "outside the scope of this probate proceeding" and that Plaintiffs "must exhaust their
administrative remedies within [the Bureau of Indian Affairs]—through the administrative appeals
process—prior to seeking review from this Board." *Id.*

Lease was executed by the Superintendent in accordance with the FBMLA" was "supported in the record," including by the "acceptance-of-lessor form signed by the Superintendent on behalf of Decedent's estate as the lessor." *Board Decision*, 67 IBIA at 131. Thus, the Board explained, "Judy's signature on the Lease is surplusage because it was neither required nor sufficient to execute a lease on behalf of Decedent's unprobated estate under the FBMLA." *Id.*

Second, Plaintiffs maintained that Judy was not an "owner" of the leased land within the meaning of the FBMLA's provisions because she held a life estate rather than a remainder interest. (*See* Regional Director Decision at 13). Plaintiffs contended that two consequences followed from this premise. For one thing, according to Plaintiffs, the Bureau "breached its trust responsibility and violated the statute" to the extent that the Superintendent "approved this lease with the intent that the proceeds be paid to" Judy instead of Plaintiffs (*id.* at 14), because the FBMLA provides that the Secretary must determine that a lease "is in the best interest of the Indian *owners* of the Indian land" before approving the lease, FBMLA § 1(a)(2)(A)(ii) (emphasis added). Similarly, Plaintiffs asserted that "[a]ny proceeds derived from the mineral lease must be distributed to" Plaintiffs rather than Judy (Regional Director Decision at 13), pursuant to the FBMLA's mandate that lease proceeds "shall be distributed to all *owners* of the Indian land . . . in accordance with the interest owned by each such *owner*[,]" FBMLA § 1(a)(2)(C) (emphases added).[9]

---

[9] To be precise, Plaintiffs argued that the lease proceeds "must be distributed to the 7 owners"—*i.e.*, the five Plaintiffs and John's two children with Judy who were deemed to be eligible heirs under the AIPRA, *see Probate Decision*, 57 IBIA at 205–06; *see also supra* note 5—"in accordance with the [1/7] interest of each." (Regional Director Decision at 13.)

The Regional Director disagreed, explaining that the FBMLA's requirement to distribute mining lease proceeds to "all owners" of the Indian land need not "be interpreted so narrowly as to not include consideration to those scenarios wherein the owner[s'] interests are subject to the life estate of another." (Regional Director Decision at 4.) The Regional Director further noted that "[t]he FBMLA is silent in regards to the rights and authority of a life tenant and holders of a remainder interest[,]" but that "owners of the Indian land" was "a commonly understood term[.]" (*Id.* at 4–5.) Thus, he determined that Congress intended for that statutory phrase to "includ[e] the variations of ownership rights resulting from life estates, joint tenancies, tenancies in common, etc." (*Id.* at 5.) He also observed that the regulations implementing the AIPRA "provid[e] that the Secretary must distribute all income, including bonuses and royalties, to the life estate holder to the exclusion of any holders of remainder interests." (*Id.* at 4 (citing 25 C.F.R. § 179.201).) Accordingly, the Regional Director concluded, "upon the exhaustion of all administrative and judicial proceedings," the "past income" from the Oil and Gas Lease "should be properly distributed to Judy Fredericks, with any future income also distributed to Judy Fredericks, during her natural lifetime, or until such time as her life estate is extinguished." (*Id.* at 5.)

On appeal, the Board saw no "error in the Regional Director's conclusion that Judy is entitled to receive all the income accruing from the Lease until the termination of her life estate." *Board Decision*, 67 IBIA at 131. The Board noted that the FBMLA "provides no definition of 'owner' different from the ordinary meaning of the term[,]" and it looked to the Bureau's regulations and the Board's previous decisions involving life estates to determine that "a 'life estate' is a limited *ownership* interest for the

lifetime of an individual." *Id.* at 146 (emphasis in original). Accordingly, the Board "conclude[d] that Judy is an 'owner' of the Allotment." *Id.* It further observed that the FBMLA "calls for the distribution of proceeds from a lease in accordance with the interest owned by each owner of the land that is subject to the lease." *Id.* at 131. And, according to the Board, the interest Judy owned under the AIPRA was a "life estate without regard to waste[,]" which entitled her "to the receipt of all income, including bonuses and royalties, from such land to the exclusion of the remaindermen." *Id.* (internal quotation marks and citation omitted). The Board thus explained that "the FBMLA and [the] AIPRA work in concert to require that Judy be given all the income generated from the Allotment and the Lease during her lifetime[,]" whereas "[t]he remaindermen have a fixed right of future enjoyment of the Allotment and are entitled to receive any Lease income that accrues after Judy's death." *Id.* at 131–32.

Similarly, the Board found that Plaintiffs had "fail[ed] to show that [the Bureau] did not properly consider whether approval of the Lease was in the best interest of [John's] undetermined heirs." *Id.* at 144. The Board determined that, for the reasons just mentioned, Plaintiffs' "argument that Judy is not an heir or owner of the Allotment" was "incorrect[,]" and noted that Plaintiffs did "not otherwise dispute that the terms of the Lease approved by the Superintendent[,]" such as the "bonus amount, royalty rate, or rental rate[,]" were "in the best interest of the undetermined heirs to the Allotment[.]" *Id.* Indeed, the Board pointed out, "absent [the Bureau's] execution and approval of the Lease while [John's] probate remained pending, *none* of the then-undetermined heirs would receive royalties from production during that time[.]" *Id.*

## C.     Procedural History

On September 2, 2020, Plaintiffs filed a five-count complaint in this Court against the DOI and its Secretary (who was then David Bernhardt) in his official capacity, seeking judicial review of the DOI's decision regarding the Oil and Gas Lease. (*See* Compl. ¶¶ 1–6.) Three of the five counts are relevant here. Count I of the complaint asserts that the Board's August 2020 decision involving the Oil and Gas Lease violated the APA, because it was "arbitrary and capricious and unsupported by substantial evidence insofar as it concluded that the Superintendent executed the Oil Lease by signing the 'Acceptance' form." (*Id.* ¶ 91.) Plaintiffs also claim in Count I that "the Oil Lease Decision is arbitrary and capricious and not in accordance with law insofar as it upheld the Superintendent's decision to execute a lease, at the life tenant's behest, that would direct the trust lands' mineral wealth to the life tenant and destroy the interests of the remaindermen in the mineral wealth they own." (*Id.* ¶ 92.) Count III similarly alleges that "that the Department violated its trust and fiduciary duties by approving and/or executing the Oil Lease and by distributing the proceeds of the Oil Lease to Judy Fredericks, and that further disbursements of Oil Lease proceeds from the estate [account] to anyone other than the heirs of Fredericks, Jr. constitutes a failure to protect the Heirs' trust property." (*Id.* ¶ 105.) And Count V seeks an accounting of the trust property and the proceeds from the mining activities on the trust property. (*See id.* ¶¶ 114–18.)[10] In their complaint, Plaintiffs seek an order setting aside the Board's

---

[10] Plaintiffs' complaint also seeks judicial review of another Board decision involving an agricultural lease on John Fredericks, Jr.'s trust lands. (*See* Compl. ¶¶ 5–6 (citing *Fredericks v. Great Plains Reg'l Dir.*, 63 IBIA 274 (2016)).) Counts II and IV of the complaint assert violations of the APA and the Department's trust duties based on the agricultural lease decision, and Count V further seeks an accounting of the proceeds from leasing the trust lands for agricultural purposes. (*See id.* ¶¶ 96–101, 108–13, 118.) Those counts are irrelevant to the instant motion for a preliminary injunction, as

challenged decision concerning the Oil and Gas Lease and also declaratory and injunctive relief. (*See id.*, Prayer for Relief.)

The day after filing the complaint, Plaintiffs moved for "a preliminary injunction enjoining the Defendants from taking any further steps to effectuate the Oil Lease Decision, including prohibiting the Department from distributing any funds from the estate account of John Fredericks, Jr. or any proceeds of the Oil Lease (including royalties) until this Court resolves [Plaintiffs'] suit." (Pls.' Mot. at 24.) Plaintiffs assert that they are likely to succeed on the merits of their challenges to the Board's decision, both because the Board "erred in holding that . . . the Superintendent's signature on the 'Acceptance' form sanctioned Judy's patently unlawful lease" (*id.* at 10), and because the Superintendent "violated the FBMLA by approving a lease at the behest of the life tenant that directed payments under a mineral lease to the life tenant instead of the remaindermen who own the mineral rights" (*id.*). Plaintiffs also claim that they "face irreparable monetary harm" because, "[a]bsent a preliminary injunction, there is an imminent risk that the Department will distribute the proceeds of the oil lease to the life tenant, who could dissipate the funds immediately." (*Id.* at 4.)[11] Plaintiffs further contend that "[t]he balance of equities also favors preserving the status quo[,]" as the DOI "took *seven years* to resolve [Plaintiffs'] challenge to the oil

---

Plaintiffs have stated that they "do not seek provisional relief concerning [the agricultural lease] decision." (Pls.' Mot. at 2 n.3.)

[11] According to Plaintiffs, "[s]ometime after the Regional Director's February 15, 2017 decision, the [Bureau] began distributing the proceeds from the Oil Lease to Judy Fredericks, without notice to" Plaintiffs. (Fredericks Decl. ¶ 17.) However, Plaintiffs maintain that "over $2.8 million in proceeds from the Oil Lease remains in the estate . . . account." (*Id.*) The DOI has "agreed not to disburse funds pending this Court's disposition of [Plaintiffs'] motion for a preliminary injunction[,]" although the agency apparently declined Plaintiffs' request to refrain from distributing any funds until this Court issues a decision on the merits of the claims brought in this case. (Pls.' Mot. at 9.)

lease," and the DOI "cannot fairly object to deferring distributions for the limited time it will take to resolve this straightforward action." (*Id.*)

In opposition to Plaintiffs' motion for a preliminary injunction, the DOI asserts that Plaintiffs' arguments that "the Oil Lease at issue was never properly executed" and that "Judy is not entitled to benefit from the mineral resources of the allotment" are "not likely to succeed on the merits." (Defs.' Opp'n at 20.) The DOI also contends that "[t]his case concerns Plaintiffs' alleged loss of income generated from a mineral lease[,]" and "such monetary harms are paradigmatically not irreparable." (*Id.* at 7.) Finally, according to the DOI, "the public interest factors also favor denial of the motion[,]" as "[t]he injunctive relief Plaintiffs seek would unfairly further delay Judy's receipt of the income that by law belongs to her." (*Id.* at 9.)

This Court held a motion hearing on November 24, 2020 (*see* Min. Entry of Nov. 24, 2020), and Plaintiffs' motion for a preliminary injunction is now ripe for decision.

## II. MOTIONS FOR PRELIMINARY INJUNCTIONS IN CASES CHALLENGING AGENCY ACTION

The purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). When a plaintiff seeks a preliminary injunction based on a "claim that he will be irreparably injured by the unlawful actions of a federal administrative agency, the typical request asks the court to suspend implementation of the challenged agency action during the pendency of the lawsuit, which is an authorized means of preserving the status quo and preventing harm to the plaintiff pending the outcome of the litigation." *Make the Rd. N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 22–23

(D.D.C. 2019), *rev'd on other grounds*, 962 F.3d 612 (D.C. Cir. 2020). And it is precisely because such interim relief imposes a restraint on a defendant before the parties' rights have been conclusively adjudicated that a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." (internal quotation marks and citation omitted)).

When evaluating a motion for a preliminary injunction, the Court is required to "assess prospectively the merits of the plaintiffs' case and their need for immediate judicial intervention." *Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 203 (D.D.C. 2011). In particular, a party seeking a preliminary injunction "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The "most significant" of these four factors are the "likelihood of the movant's success on the merits of his claims and whether or not he is likely to suffer irreparable injury while the lawsuit is pending, because these factors relate directly to the purpose of a preliminary injunction." *Make the Rd.*, 405 F. Supp. 3d at 23–24. "[I]t is particularly important for the movant to demonstrate a substantial likelihood of success on the merits, because absent a substantial indication of likely success on the merits, there would be no justification for the Court's intrusion into the ordinary processes of

administration and judicial review." *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 281 F. Supp. 3d 88, 99 (D.D.C. 2017) (internal quotation marks and citation omitted), *aff'd*, 897 F.3d 314 (D.C. Cir. 2018).  In addition, "[a] movant's failure to show any irreparable harm" is "grounds for refusing to issue a preliminary injunction[,]" *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297, since "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies," *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (internal quotation marks and citation omitted). [12]

## III.   ANALYSIS

Plaintiffs bear the burden of making a "clear showing" that they are entitled to the "extraordinary remedy" of a preliminary injunction.  *Winter*, 555 U.S. at 22.  In this regard, Plaintiffs maintain that they are likely to succeed on the merits of their claims that the Board's decision to affirm the legality of the Oil and Gas Lease was arbitrary and capricious (Count I), and that the DOI violated its fiduciary duties by approving the lease and distributing the existing proceeds to Judy (Count III).  Plaintiffs further maintain that they would suffer irreparable harm in the absence of a preliminary injunction, because they would not be able to recover the distributed proceeds from the

---

[12] Before the Supreme Court's decision in *Winter*, courts in this jurisdiction evaluated the four preliminary-injunction factors on a "sliding scale[,]" such that "an unusually strong showing on one of the factors" could overcome a weaker "showing on another factor."  *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009) (internal quotation marks and citation omitted).  The D.C. Circuit has since suggested that *Winter* established that "likelihood of success" and "likelihood of irreparable harm" are "independent, free-standing requirement[s] for a preliminary injunction," *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (internal quotation marks and citation omitted), although the Circuit has characterized this as an "open question[,]" *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014), and has repeatedly declined to decide the issue, *see, e.g., League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016); *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 n.1 (D.C. Cir. 2016); *Aamer*, 742 F.3d at 1043.  Nevertheless, it is reasonably "clear that where the plaintiff can show *neither* harm nor success, no relief is warranted."  *Damus v. Nielsen*, 313 F. Supp. 3d 317, 326 (D.D.C. 2018).

DOI at the conclusion of this case, and that the balance of the equities and the public interest weigh in favor of the issuance of a preliminary injunction. This Court disagrees with Plaintiffs' insistence that the standard factors for a preliminary injunction are satisfied, for the reasons explained below.

### A. Plaintiffs Have Not Established A Likelihood Of Success On The Merits

At bottom, Plaintiffs' APA challenges to the Board's decision to uphold the Oil and Gas Lease present two questions of statutory interpretation: first, whether the Acting Superintendent's signature on the Acceptance of Lessor form constituted a proper "execut[ion]" of the Oil and Gas Lease for the purpose of section 1(a)(3) of the FBMLA (*see* Pls.' Mot. at 11), and second, whether Judy qualifies as an "owner" of the lands subject to the Oil and Gas Lease within the meaning of section 1(a)(2)(C) of the FBMLA, which requires that lease proceeds be "distributed to all *owners* of the Indian land . . . in accordance with the interest owned by each such *owner*" (*see id.* at 15 (emphases added)). The DOI has taken a position on these questions in the context of the dispute at issue here, and because that agency is statutorily authorized to administer the FBMLA and the AIPRA, *see* 25 U.S.C. §§ 396, 2206, 2218, this Court must apply the familiar two-step *Chevron* framework to determine whether to afford deference to the agency's statutory interpretations (and thereby assess Plaintiffs' likelihood of success with respect to the merits of their challenges to the agency's decision), *see Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–45 (1984).[13]

---

[13] Under the *Chevron* framework, if "Congress has directly spoken to the precise question at issue[,]" a reviewing court "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. However, if "Congress has not directly addressed the precise question at issue," insofar as "the statute is silent or ambiguous with respect to the specific issue," the court must then determine "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

The Board concluded that the FBMLA permits the method of execution that the Superintendent used to endorse the Oil and Gas Lease, and it further determined that life tenants without regard to waste (such as Judy) are "owners" of the leased lands for the purpose of section 1(a)(2)(C) of the FBMLA.

As explained below, this Court finds that both of the Board's conclusions warrant deference, and as a result, Plaintiffs are not likely to succeed on the merits of their APA claims.

     1.     <u>The FBMLA Is Silent Or Ambiguous Concerning The Authorized Manner Of Execution Of A Lease By The Secretary, And The Board's Acceptance Of The Secretary's Endorsement Is Reasonable</u>

With respect to Plaintiffs' argument that "the Oil Lease was never properly executed[,]" because the Superintendent's signature on the Acceptance of Lessor form did not "constitute[] execution of the underlying lease" (Pls.' Mot. at 10–11), the Court begins by noting that the FBMLA merely provides that "[t]he Secretary may execute a mineral lease or agreement that affects individually owned Indian land on behalf of an Indian owner if[,]" as relevant here, "that owner is deceased and the heirs to, or devisees of, the interest of the deceased owner have not been determined[,]" FBMLA § 1(a)(3)(A).  Moreover, and notably, the statute is silent as to *how* such a lease must be executed.  Thus, "execute" could mean "[t]o make (a legal document) valid by signing[,]" perhaps implying that the Secretary must sign the lease document itself. *Execute*, Black's Law Dictionary (11th ed. 2019).  Or that term could mean "to bring (a legal document) into its final, legally enforceable form[,]" such that no particular means of signing the lease is required. *Id.*

The Board reasonably adopted the latter interpretation and concluded that the Superintendent "executed the Lease in accordance with the FBMLA" by signing the

Acceptance of Lessor form. *Board Decision*, 67 IBIA at 143. As the Board observed,

"nothing in the FBMLA" or the Bureau's regulations governing mineral leases "requires

that a negotiated lease be prepared on a standard form[,]" nor is the Superintendent

prohibited from executing a lease through a separate document incorporated into the

lease. *Id.* at 142. Thus, "acceptance-of-lessor forms are 'commonly utilized to

document consent for oil and gas leases on the Fort Berthold Indian Reservation.'" *Id.*

(quoting Regional Director Decision at 3). The Acceptance of Lessor form at issue here

identified the lessor as "John Fredericks Jr. (Estate)[,]" and the Superintendent signed

above the line stating "Superintendent, John Fredericks Jr. Estate[.]" (Acceptance of

Lessor at 2.) The Superintendent also "cited '25 C.F.R. § 212.21(a)(b)(c)' as

authority," and those provisions generally "authorize[] the Superintendent to execute a

lease on behalf of the undetermined heirs of a decedent's estate[.]" *Board Decision*, 67

IBIA at 142 (quoting Acceptance of Lessor at 2). Consequently, there can be no serious

dispute that the Superintendent intended to "execute" the Oil and Gas Lease as

authorized by the FBMLA.[14]

Plaintiffs' primary objection to the Board's determination that the Oil and Gas

Lease was validly executed is their argument that the Acceptance of Lessor form merely

---

[14] The Board apparently understood Plaintiffs' challenge to the execution of the Oil and Gas Lease to be raising a factual issue rather than a question of statutory interpretation. *See Board Decision*, 67 IBIA at 141 ("We reject Appellants' arguments concerning the sufficiency of the evidence to support the Regional Director's finding that the Superintendent executed the Lease pursuant to the FBMLA."). To the extent Plaintiffs are contending in this Court that the agency's finding on this score was "unsupported by substantial evidence[,]" 5 U.S.C. § 706(2)(E), this Court further concludes that Plaintiffs have not established a likelihood of success as to that argument. Under the substantial-evidence standard, "the threshold for such evidentiary sufficiency is not high": substantial evidence is "more than a mere scintilla" and requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotation marks and citation omitted). And, as explained herein, the Superintendent's signature on the Acceptance of Lessor form constitutes substantial evidence to support the Board's finding that the Superintendent executed the Oil and Gas Lease pursuant to the FBMLA, given the plain language of the form.

"'accepts the bonus' paid by Kodiak Oil" and does not constitute assent to the terms of the lease itself. (Pls.' Mot. at 10 (quoting Acceptance of Lessor at 2).) In its consideration of this argument, the Board rightly concluded that Plaintiffs have misread the language of the form. *See Board Decision*, 67 IBIA at 141–43.

To be sure, the form *opens* by reciting the bonus amount (*see* Acceptance of Lessor at 2 ("The undersigned hereby accepts the bonus, in the amount of $300/acre or their proportionate share thereof, offered by Kodiak Oil & Gas (USA) Incorporated . . . .")); however, as the Board recognized, the form *also* includes the "royalty rate, rental rate, and lease duration, and states that it is to be attached to and become a part of the Lease[,]" *Board Decision*, 67 IBIA at 143 (citing Acceptance of Lessor at 2). Moreover, and significantly for present purposes, the final sentence of the Acceptance of Lessor form—*i.e.*, "[t]he undersigned further agrees that this acceptance shall be attached to the formal lease contract, when signed by the lessee, and become a part thereof, *with the same effect and in lieu of my signature thereon*" (Acceptance of Lessor at 2 (emphasis added))—indisputably indicates that the Superintendent specifically intended that his signature on the form would have "the same effect" as if he had signed the lease itself.

Even if Plaintiffs were correct that the Superintendent's signing of the Acceptance of Lessor form was technically insufficient to constitute execution of the Oil and Gas Lease for FBMLA purposes, it is unlikely that Plaintiffs will be able to show that any such error was prejudicial. *See* 5 U.S.C. § 706 (requiring reviewing courts to take "due account" of "the rule of prejudicial error"). Plaintiffs attempt such a showing, by suggesting that the agency's substantive review of the lease terms might

have differed upon proper execution, insofar as "the Department is more likely to defer to the negotiators' assessments" when "the Department believes its responsibility is merely to approve a lease negotiated at arm's length and consented to by Indian owners," whereas "the Department bears greater responsibilities" when "the Department itself must execute a lease in the best interest of the Indian owners[.]" (Pls.' Reply in Supp. of Mot. for Prelim. Inj. ("Pls.' Reply"), ECF No. 12, at 7.) But Plaintiffs have not established that any such deference on the part of the DOI when it reviewed the terms of the Oil and Gas Lease "resulted from the Department's failure to follow the FBMLA's procedures[,]" as Plaintiffs contend. (*Id.*) This is because the FBMLA requires the Secretary to "determine[] that approving the lease or agreement is in the best interest of the Indian owners of the Indian land" *in any event*, FBMLA § 1(a)(2)(A)(ii), meaning that the same approval requirements apply regardless of whether the Secretary executes the lease document itself or approves a previously executed lease on a separate form. It is clear that "[a]s incorporated into the APA, the harmless error rule requires the party asserting error to demonstrate prejudice from the error[,]" *First Am. Disc. Corp. v. Commodity Futures Trading Comm'n*, 222 F.3d 1008, 1015 (D.C. Cir. 2000) (internal quotation marks and citation omitted), and this Court finds that it is unlikely that Plaintiffs will come anywhere close to satisfying that burden under the circumstances that Plaintiffs have presented in this case.

2.     The FBMLA Does Not Unambiguously Foreclose The Conclusion That Holders Of A Life Estate Without Regard To Waste Are "Owners," And The Board's Determination That Such Interest Holders Do So Qualify Is Entitled To Deference

Plaintiffs' primary argument on the merits of their APA claims is the contention that the term "owners" as used throughout the FBMLA refers only to remaindermen

such as Plaintiffs and excludes life tenants without regard to waste like Judy.  (*See, e.g.*, Pls.' Mot. at 18; *see also* Pls.' Reply at 9 (asserting that "Congress incorporated into the FBMLA the settled understanding that the 'owners' of mineral wealth are the remaindermen").)  But the FBMLA is not definitive with respect to the question of whether holders of a life estate without regard to waste are "owners" for the purpose of the statute, and the Board's conclusion that holders of such interests do qualify as owners is reasonable, as explained below.

      a.      *The Term "Owner" Is Susceptible To More Than One Meaning, And The Board's Determination That "Owners" Includes Holders Of A Life Estate Without Regard To Waste Is Reasonable*

Under the first step of the *Chevron* analysis, the "precise question at issue[,]" *Chevron*, 467 U.S. at 842, is whether a holder of a life estate without regard to waste qualifies as an "owner[] of the Indian land" in which she holds an interest within the meaning of the FBMLA, *see* FBMLA § 1(a)(2)(A)(ii), (C).  To determine whether "Congress has directly spoken to" that issue, *Chevron*, 467 U.S. at 842, this Court "employ[s] traditional tools of statutory construction," *id.* at 843 n.9, which include the statute's "text, structure, purpose, and legislative history[,]" *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 330 (D.C. Cir. 2020) (internal quotation marks and citation omitted); *cf. Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (observing that courts must consider "the text, structure, history, and purpose of a regulation" before "concluding that a rule is genuinely ambiguous").

Beginning with the statutory text, the FBMLA does not specifically define "owner," but "owner" is a commonly used term in property law and other areas.  For instance, Black's Law Dictionary defines an "owner" as "[s]omeone who has the right

to possess, use, and convey something; a person in whom one or more interests are vested[,]" and that same source clarifies that "[a]n owner may have complete property in the thing or may have parted with some interests in it[.]" *Owner*, Black's Law Dictionary (11th ed. 2019); *see also Owner*, Black's Law Dictionary (5th ed. 1979) ("The primary meaning of the word [owner] as applied to land is one who owns the fee and who has the right to dispose of the property, but the term also includes one having a possessory right to land or the person occupying or cultivating it."); Restatement (First) of Property § 10 (1936) (defining "owner" as "the person who has one or more interests"). Thus, it is not unambiguously clear that an "owner" for the purpose of section 1(a)(2)(C) of the FBMLA must be someone who has the right to convey an interest in a parcel of land in the Fort Berthold Reservation; rather, "owner" is broad enough to include a life tenant without regard to waste—*i.e.*, one who has a possessory interest in the land that carries with it the right to use and benefit from the land exclusively during her lifetime, insofar as she is "entitled to the receipt of all income, including bonuses and royalties, from such land to the exclusion of the remaindermen." 25 U.S.C. § 2201(10).

Still, the term "owner" has been "given a wide variety of constructions and interpretations" when found in statutes, 73 C.J.S. *Property* § 39, and the types of interests that qualify one as an owner "will depend on particular circumstances[,]" *id.* § 40. Therefore, "one having a particular estate or interest may be regarded as an owner for some purposes while not so regarded for others." *Id.*; *see also, e.g.*, *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 327–28 (2d Cir. 2000) (explaining that "the term 'owner' has no natural meaning that can resolve the present

[statutory interpretation] dispute[,]" and noting that "[c]ourts and commentators have supplied no consistent guidance as to which rights in the proverbial property bundle define ownership"); *Cooper Indus., Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 876 F.3d 119, 129 (5th Cir. 2017) (observing that "[c]ourts have recognized that 'own' can vary with the context"). Thus, for present purposes, it is significant that nothing in the FBMLA's text clearly indicates that Congress intended for the term "owners" as used in that statute to *exclude* life tenants without regard to waste—in fact, the FBMLA does not mention life estates, or life estates without regard to waste, at all. *See* FBMLA § 1(a).[15]

Nor do the FBMLA's purpose and legislative history resolve the ambiguity concerning whether Congress intended for "owner" to include life tenants without regard to waste. The Senate committee report related to the FBMLA repeatedly invokes the problem of "fractionated heirship" on the Fort Berthold Reservation—*i.e.*, multiple individuals holding an interest in a given parcel of land at the same time—and the associated difficulties with obtaining consent for oil and gas development on that land. S. Rep. No. 105-205, at 3–4; *see also id.* at 10 (statement of Edward B. Cohen, Deputy Solicitor, Dep't of Interior). Like the statute itself, the report contains no references to

---

[15] The Court's understanding of the capacious scope of the term "owner" as it appears in the FBMLA is informed by another statutory note to the Mineral Leasing Act of 1909, which is codified in the same location as the FBMLA. That note specifically defines the "owner" of an "interest in land" to mean "the beneficial owner of the interest[,]" Leases of Navajo Indian Allotted Lands, Pub. L. No. 106-462, tit. II, § 201(a)(5), 114 Stat. 1991, 2008 (2000) (codified at 25 U.S.C. § 396 note), and a "beneficial owner" is "[o]ne recognized in equity as the owner of something because use and title belong to that person, even though legal title may belong to someone else[,]" especially "one for whom property is held in trust[,]" *Beneficial Owner*, Black's Law Dictionary (11th ed. 2019). A holder of a life estate without regard to waste under the AIPRA appears to qualify as a beneficial owner of the mineral interests for the reasons discussed above, and while this statutory provision was enacted after the FBMLA and does not apply specifically to Indian lands on the Fort Berthold Reservation, it supports the conclusion that the term "owner" as used in the FBMLA does not unambiguously exclude life tenants without regard to waste.

life estates or life estates without regard to waste, and there is no indication that the FBMLA's drafters gave any thought to how the law's consent and distribution provisions should operate when an interest in a tract of land is divided between a life tenant and remaindermen.

That said, it is illuminating that, before the FBMLA's enactment, the Secretary of the DOI had promulgated regulations governing execution of mineral leases, and those regulations specifically contemplated that a "life tenant" *can* be an "owner" of mineral interests. *See* 25 C.F.R. § 212.21(c) (1996) ("If an owner is a life tenant, the procedures set forth in 25 CFR part 179 (Life Estates and Future Interests), shall apply."); *cf. Glob. Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 48 (2007) (noting that "regulatory history helps to illuminate the proper interpretation and application" of statutory provisions). The DOI's regulations concerning life estates also generally required the Secretary to "invest the principal" from a mineral lease, "with interest income to be paid [to] the life tenant during the life estate," while "[t]he principal" was to be "distributed to the remainderman upon termination of the life estate." 25 C.F.R. § 179.4(c) (1988). Moreover, and critically, Congress did nothing to alter this understanding of the relevant ownership interests in the context of mineral leases when it enacted the FBMLA in 1998.[16]

---

[16] Again, the FBMLA deviated from the Mineral Leasing Act of 1909 and its implementing regulations in only two respects: first, Congress relaxed the requirement that the Secretary "secure the consent of *all* owners who have an undivided interest in a parcel of land that would be the subject of a mineral lease[,]" S. Rep. No. 105-205, at 4 (emphasis added), by providing that the Secretary need only obtain consent from "the owners of *a majority* of the undivided interest in the Indian land[,]" so long as the Secretary also "determines that approval of the lease or agreement is in the best interest of the Indian owners[,]" *id.* at 6 (emphasis added); *see also* FBMLA § 1(a)(2)(A); and, second, whereas the Mineral Leasing Act and its regulations "require[d] the Secretary to have a public auction or advertised sale" if "the owner is deceased and the heirs to or devisees of the interest of the deceased owner have not been determined or cannot be located[,]" S. Rep. No. 105-205, at 7; *see also* 25 U.S.C. § 396; 25 C.F.R. § 212.20(b), 212.21(a) (1996), the FBMLA "permits the Secretary to execute a lease or agreement in

Because nothing in the FBMLA's text or legislative history suggests that Congress intended to disturb the DOI's understanding that life tenants should be considered "owners" of the mineral assets in which they hold an interest, the Court concludes that the FBMLA does not unambiguously foreclose *that* interpretation of "owners," as Plaintiffs here assert. In other words, at most, the question of statutory interpretation that the instant matter raises implicates a "statutory gap" concerning the meaning of "owner" that Congress implicitly authorized the agency to "fill . . . in [a] reasonable fashion." *Catawba Cnty. v. EPA*, 571 F.3d 20, 35 (D.C. Cir. 2009) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005)). Thus, this Court must proceed to *Chevron*'s step two, and thereby determine whether the agency's interpretation of "owner" for the purpose of the FBMLA is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843; *cf. Kisor*, 139 S. Ct. at 2416 (explaining that an agency's reading of a regulation "must come within the zone of ambiguity the court has identified after employing all its interpretive tools" to qualify as "reasonable"). This standard is "highly deferential[,]" *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 667 (D.C. Cir. 2011), and, in this Court's view, the Board's interpretation of "owners" as including life tenants without regard to waste easily clears that threshold.

To start, the Board's construction is plainly "textually defensible[.]" *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 419 (1993). That is, as explained above, the term "owner" is broad enough to encompass interests that permit the holder to use and benefit from the land, *see, e.g.*, *Owner*, Black's Law Dictionary (11th ed. 2019), and,

---

these circumstances without first conducting a sale[,]" S. Rep. No. 105-205, at 7; *see also* FBMLA § 1(a)(4).

per the AIPRA, a life tenant without regard to waste is "entitled to the receipt of all income, including bonuses and royalties, from such land[,]" 25 U.S.C. § 2201(10).

The Board's reading also "fits the design of the [FBMLA] as a whole and . . . its object and policy." *Good Samaritan Hosp.*, 508 U.S. at 418 (internal quotation marks and citation omitted); *see also Vill. of Barrington*, 636 F.3d at 667 (upholding agency's interpretation that was "rationally related to the goals of" the underlying statute (internal quotation marks and citation omitted)). Again, Congress enacted the FBMLA to "facilitate the leasing of mineral rights within . . . the Fort Berthold Reservation[,]" S. Rep. No. 105-205, at 1, in order to ensure that "Indian owners . . . gain maximum economic benefit from their ownership[,]" *id.* at 11 (statement of Edward B. Cohen, Deputy Solicitor, Dep't of Interior). The Board's interpretation of "owners" (pursuant to which life tenants without regard to waste are entitled to receive proceeds from mineral leases, *see Board Decision*, 67 IBIA at 147), assures that life tenants without regard to waste can benefit economically from their ownership interest, consistent with that statutory goal. And a contrary interpretation could effectively disincentivize mineral leasing and development on trust lands within the Fort Berthold Reservation, since neither the life tenant nor the remaindermen would receive lease proceeds during the life tenant's lifetime.[17]

---

[17] There is no dispute that Judy has a life estate interest in the land at issue here, and under the AIPRA, a life estate without regard to waste is the default interest that a surviving spouse receives in the decedent's trust lands when the decedent dies intestate and no tribal probate code applies. *See* 25 U.S.C. § 2206(a)(1)(B), (2)(A)(i). The AIPRA's legislative history does not specifically discuss the rationale behind this default rule, *see* H.R. Rep. No. 108-656, at 4–5; S. Rep. No. 108-264, at 17–24, but it is reasonably apparent that Congress chose to give surviving spouses a life estate without regard to waste, rather than an ordinary life estate, in order to provide spouses with an additional source of financial support. Thus, if the FBMLA is interpreted to exclude such interest holders, no one would be eligible to receive lease proceeds as "owners" during the lifetime of a surviving spouse (such as Judy).

It is also the case that the DOI itself has long considered life estate holders to be "owners" for the purpose of mineral-lease rights and obligations, and did so even prior to Congress's enactment of the FBMLA, as explained above. *See* 25 C.F.R. § 212.21(c). Thus, it is reasonable to conclude that, when Congress used "owner" in the FBMLA, it did not intend to exclude life tenants from the scope of that term. *See Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014) (explaining that courts "presume that Congress is aware of existing law when it passes legislation" (internal quotation marks and citation omitted)). And as a conceptual matter, life tenants *without regard to waste* have an even stronger claim to "owner" status than mere life tenants, because unlike the latter, the former are "entitled to the receipt of all income, including bonuses and royalties, from such land to the exclusion of the remaindermen." 25 U.S.C. § 2201(10).

b.    *Plaintiffs' Arguments To The Contrary Are Unavailing*

Plaintiffs make several contentions that are apparently designed to demonstrate that the Board's interpretation of "owners" is not only unambiguously foreclosed by the statute, but is also unreasonable and otherwise not entitled to deference. In this Court's view, none of Plaintiffs' arguments is persuasive.

For example, Plaintiffs vigorously maintain that "under the common law, life tenants are not owners of mineral estates[,]" and only the remaindermen have the right to exploit mineral assets. (Pls.' Mot. at 15; *see also, e.g.*, *id.* at 13 ("'[A] life tenant, acting alone, is not entitled to extract oil, gas or other minerals from the land'; rather, mineral assets belong to the remaindermen." (quoting 1-8 Eugene O. Kuntz et al., The Law of Oil and Gas § 8.4)).) However, as this Court has thus far repeatedly observed, the interest at issue here is not an ordinary life estate; rather, it is a life estate *without*

*regard to waste*.  Moreover, at most, Plaintiffs' authorities establish that a life tenant of a *fee simple* interest in land might not be considered an "owner" of mineral assets associated with that interest.  But the ownership question here arises in the entirely different context of interests in land that the United States holds *in trust* for certain members of the Three Affiliated Tribes of the Fort Berthold Reservation.  *See W. Ref. Sw., Inc. v. U.S. Dep't of Interior*, 450 F. Supp. 3d 1214, 1227 (D.N.M. 2020) ("[B]ecause the United States holds title to Indian allotments in trust, certain typical individual property rights do not apply.").  Put differently, there is no indication that Congress intended for "owners" of Indian lands under the FBMLA to be coextensive with "entitle[ment] to extract oil [or] gas" from the land, "acting alone[.]"  (Pls.' Mot. at 13.)  *See Cobell*, 240 F.3d at 1088 (emphasizing that, unlike holders of fee simple property interests, holders of interests in trust lands cannot lease their mineral interests "without the federal government's approval").  Thus, the common-law principles regarding ordinary life estates and fee interests upon which Plaintiffs rely do not compel their preferred interpretation of the FBMLA.[18]

In this same vein, Plaintiffs also suggest in passing that, as a life tenant, Judy is not an "heir" within the meaning of "the 1886 allotment agreement under which the lands were originally allotted[.]"  (Pls.' Mot. at 14.)  But Plaintiffs' reliance on the definition of "eligible heirs" in AIPRA, which by its terms applies only "for purposes of section 2206 of this title," 25 U.S.C. § 2201(9), is misplaced.  An "heir" generally refers to "[s]omeone who, under the laws of intestacy, is entitled to receive an intestate

---

[18] To be clear, this Court need not, and does not, decide that a holder of an ordinary life estate would be considered an "owner" within the meaning of the FBMLA.  The Court merely notes that the common-law rules that Plaintiffs invoke do not unambiguously foreclose a construction of "owner," as used in the FBMLA, that includes life tenants.

decedent's property." *Heir*, Black's Law Dictionary (11th ed. 2019). And Judy was unquestionably entitled to receive property from John, who is an intestate decedent to whom Judy was legally married at the time of his death. *See Probate Decision*, 57 IBIA at 205–06.

Plaintiffs further assert that "critical FBMLA provisions would become incoherent" if "life tenants were 'owners[.]'" (Pls.' Mot. at 16.) For instance, Plaintiffs contend that it is "impossible" to assess whether a lease is in "'the best interest of the Indian owners'" if "both life tenants and remaindermen are owners," since "[i]n nearly every case, the interests of the life tenant will collide head-on with the interests of the remaindermen." (*Id.* at 17 (quoting FBMLA § 1(a)(2)(A)(ii)).) But Plaintiffs misunderstand the nature of the statutory best-interest determination. The FBMLA's legislative history specifically notes that the Secretary's best-interest determination would be "governed by regulations found at 25 C.F.R. 212.3," S. Rep. No. 105-205, at 6, and as previously explained, those regulations require the Secretary to consider factors including "economic considerations, such as date of lease expiration; probable financial effect on the Indian mineral owner; leasability of land concerned; need for change in the terms of the existing lease; marketability; and potential environmental, social, and cultural effects[,]" 25 C.F.R. § 212.3. When considered as a whole, these factors indicate that the best-interest determination is best understood as requiring the Secretary to evaluate whether the lease to be approved is superior to other potential leases, or whether the land should be leased at all—*i.e.*, whether a lease is in the best interest of *all owners collectively*—and is *not* designed to permit the Secretary to assess whether the lease at issue will advantage or disadvantage certain owners over

others.  Thus, contrary to Plaintiffs' position, a statutory interpretation under which holders of life estates without regard to waste are deemed "owners" does not render the best-interest determination "impossible."  (Pls.' Mot. at 17.)

The Court similarly rejects Plaintiffs' contention that it would be "impossible" to determine whether "'the owners of a majority of the undivided interest [in the Indian land] . . . consent'" to a lease if both life tenants and remaindermen are "owners," because "[t]here is no way to aggregate these different types of interests" in order to "determine whether the 'majority' of life tenants plus remaindermen consents[.]"  (Pls.' Mot. at 16–17 (quoting FBMLA § 1(a)(2)(A)(i)).)  This argument appears to assume that the statutory language dictates the specific method of "aggregation" that Plaintiffs propose, when it does not.  Indeed, based on this statutory authorization, it appears that the DOI could reasonably require that holders of a majority of the life estate consent to a lease, and assess, separately, the wishes of the holders of a majority of the remainder interest.  Or the DOI could reasonably estimate the proportion of the value of the lease attributable to the life estate based on the life tenant's age (indeed, the DOI had already created such tables at the time of the FBMLA's enactment).  *See* 25 C.F.R. § 179.5 (1988).  Thus, this Court need not definitively determine how the FBMLA's consent provision operates in the context of the leasing of mineral interests that are subject to a life estate in order to conclude that interpreting "owners" to include life tenants without regard to waste does not "introduce another *incoherence* into" the FBMLA, as Plaintiffs suggest.  *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1812 (2019) (emphasis added).

In one of their most substantial lines of attack, Plaintiffs further suggest that the Board "erred by relying on the AIPRA" *at all* in assessing whether Judy is an "owner"

within the meaning of the FBMLA. (Pls.' Mot. at 18.) In particular, Plaintiffs point to the provision in the AIPRA stating that "[n]othing in this chapter shall be construed to supersede, repeal, or modify any general or specific statute authorizing the grant or approval of any type of land use transaction involving fractional interests in trust or restricted land" (*id.* (quoting 25 U.S.C. § 2218(g))), and they insist that the AIPRA is impermissibly "being applied to 'modify'" the FBMLA if "applying the [AIPRA] causes you to reach a different result" than "the results you'd reach under the [FBMLA] before the [AIPRA] was passed" (Hr'g Tr. at 23:3–12).[19] But Plaintiffs misunderstand the relevant statutory language. Section 2218(g) clarifies that the AIPRA does not "supersede, repeal, or modify" the FBMLA "*statute*" itself, 25 U.S.C. § 2218(g) (emphasis added); it does not establish or even suggest that the AIPRA's probate principles are entirely irrelevant to the appropriate application of the FBMLA to any particular set of circumstances.

To understand why Plaintiffs place far too much stock in section 2218(g), consider the well-established fact that property interests similar to life estates without regard to waste existed long before the AIPRA's enactment. *See, e.g.*, *Belt v. Simkins*, 39 S.E. 430, 431 (Ga. 1901) (noting that "[o]ne who creates a life estate for the benefit of another, either by deed or by will, may, if he sees proper, provide that the tenant for life shall not be held liable for waste[,]" and that "[s]uch a tenant is characterized as a tenant for life who holds without impeachment for waste"). Thus, holders of such interests might well have been considered "owners" for FBMLA purposes entirely independent of the AIPRA's existence. The AIPRA neither creates life estates without

---

[19] Citations to the transcript of the November 24, 2020, motion hearing are to a rough draft of the transcript, because a final version is not available.

regard to waste nor changes how the FBMLA accounts for such property interests; instead, it merely increases the prevalence of life estates without regard to waste in the context of Indian trust lands by making them the default interest in the decedent's trust lands that a surviving spouse receives if the decedent dies without a will and no tribal probate code applies. *See* 25 U.S.C. § 2206(a)(1)(B)(i), (2)(A). In other words, just as the Board explained in rejecting the argument that Plaintiffs now advance, the AIPRA and its implementing regulations "work in tandem" with the FBMLA, *Board Decision*, 67 IBIA at 145, and "do not conflict with, amend, or modify" that statute, *id.* at 148, insofar as they merely "specify[] the extent of the ownership interest of a life tenant[,]" *id.*[20]

Aside from assailing the substantive merits of the Board's statutory interpretation, Plaintiffs also proffer several reasons why *Chevron* deference is unwarranted, even if permitted in this context.[21] Most notably, Plaintiffs invoke the Indian canon, which counsels that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit[.]" *Montana v.*

---

[20] Plaintiffs' reliance on section 2218(f) of the AIPRA (Pls.' Mot. at 18)—which provides that "[n]othing in this section shall be construed to amend or modify the provisions of Public Law 105-188[,]" *i.e.*, the FBMLA, or "any other Act that provides specific standards for the percentage of ownership interest that must approve a lease or agreement on a specified reservation[,]" 25 U.S.C. § 2218(f)—fails for this same reason. That is, the Board's application of the AIPRA to conclude that Judy was entitled to the mineral lease proceeds at issue here as a matter of probate law does not "amend or modify" the FBMLA within the meaning of section 2218(f).

[21] It is beyond dispute that the Board's interpretations of statutes that the DOI administers, such as the FBMLA and the AIPRA, are eligible for *Chevron* deference as a general matter. *See Williams v. Babbitt*, 115 F.3d 657, 660 n.3 (9th Cir. 1997) (explaining that the Board's "interpretation of the Reindeer Act is entitled to *Chevron* deference absent other considerations" because "[t]he Interior Department is charged with administering the Reindeer Act" and the Board "exercises final decisionmaking authority for the Secretary of Interior concerning challenges to administrative actions by Bureau of Indian Affairs . . . officials"); *see also Orton Motor, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 884 F.3d 1205, 1211 (D.C. Cir. 2018) (observing that "[a]n interpretation reached through a formal process, including adjudication, will ordinarily be reviewed under *Chevron*" (citing *United States v. Mead Corp.*, 533 U.S. 218, 230–31 (2001))).

*Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *see also, e.g.*, *Cobell*, 240 F.3d at 1103. Invoking this canon of statutory construction, Plaintiffs suggest that the relevant provisions of the FBMLA should be construed to benefit "the remaindermen—the Indian Heirs the FBMLA is designed to benefit" (Pls.' Reply at 17)—rather than life tenants, who may or may not be Indian depending on "the facts of particular cases" (*id.* at 17 n.11). But this Court need not decide whether the Indian canon "trumps *Chevron* deference" in the instant context, as Plaintiffs contend (*id.* at 16 (quoting *Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, 442 F. Supp. 3d 53, 73 (D.D.C. 2020))), because that canon is not actually implicated here. Congress has determined that surviving spouses who receive a life estate without regard to waste under the AIPRA are to be considered Indian for purposes of the statutes that govern Indian probate and leasing, even if they are not members of an Indian tribe. *See* 25 U.S.C. § 2201(2) (defining "Indian" to include "any person who is a member of any Indian tribe" as well as "an owner . . . of a trust or restricted interest in land"). And as a result, the Board's interpretation of "owners" does not disadvantage Indians vis-à-vis non-Indians in the manner that Plaintiffs suggest. *See Forest Cnty. Potawatomi Cmty. v. United States*, 330 F. Supp. 3d 269, 280 (D.D.C. 2018) (recognizing that "[t]he Indian law canon does not apply simply because the statute in question involves Indian law or Indian tribes").

Plaintiffs' remaining arguments against *Chevron* deference—that the Board did not "acknowledge[] that the statute is ambiguous" and merely "construed the common law" (Pls.' Mot. at 19–20)—fare no better. While the Board did not apply *Chevron*'s two-step analysis expressly, its decision can be fairly read as recognizing that the term "owners" is broad enough to encompass "the variations of ownership rights resulting

from life estates[,]" *Board Decision*, 67 IBIA at 146 (quoting Regional Director

Decision at 4), and then surveying the Bureau's regulations and the Board's prior

decisions, as well as common-law principles, to determine that "owners" actually

includes holders of a life estate without regard to waste, *see id.*

This all means that Plaintiffs are not likely to succeed on the merits of their APA

challenges to the Board's decision. Given both the state of the evidence and the

reasonableness of the Board's interpretation of the FBMLA, it is instead most likely

that this Court will ultimately conclude that the Superintendent properly executed the

Oil and Gas Lease, and that Judy is an "owner" of the leased trust lands within the

meaning of subsections 1(a)(2)(A)(ii) and 1(a)(2)(C) of the FBMLA, such that the

Board did not act arbitrarily and capriciously or contrary to law when it sustained the

validity of the lease and determined that all proceeds of the lease should be distributed

to Judy alone during her lifetime.

### B. Plaintiffs Will Not Be Irreparably Harmed In The Absence Of A Preliminary Injunction

This Court also concludes that Plaintiffs have failed to show they will suffer

irreparable harm absent preliminary relief. In this regard, Plaintiffs maintain that, if

proceeds of the Oil and Gas Lease are distributed to Judy during the pendency of the

instant litigation, they "may be unable to recover those proceeds even if the

Department's actions are held unlawful" in this case. (Pls.' Mot. at 21.) The DOI

appears to recognize that money damages are not available in the instant APA action,

but responds that Plaintiffs are actively pursuing a separate action for damages against

the United States in the Court of Federal Claims, through which Plaintiffs might well

recover any proceeds erroneously distributed to Judy. (*See* Defs.' Opp'n at 20.)

The D.C. Circuit "has set a high standard for irreparable injury[,]" under which "the injury must be both certain and great[,]" as well as "actual and not theoretical[,]" and "of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (internal quotation marks and citations omitted). Moreover, and importantly, the "general rule" is that "economic harm does not constitute irreparable injury." *Davis*, 571 F.3d at 1295; *see also Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (explaining that it is "well settled that economic loss does not, in and of itself, constitute irreparable harm"). This is so because "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date[] in the ordinary course of litigation[,]" such as through an award of monetary damages, "weighs heavily against a claim of irreparable harm." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98 (citation omitted); *see also Sampson*, 415 U.S. at 90 ("[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury.").

To be sure, "courts have recognized that economic loss may constitute 'irreparable harm' where a plaintiff's alleged damages are unrecoverable[,]" *Clarke v. Off. of Fed. Hous. Enter. Oversight*, 355 F. Supp. 2d 56, 65 (D.D.C. 2004), and as particularly relevant here, one potential "exception" to the "general rule" that "economic harm does not constitute irreparable injury" is "economic loss caused by federal agency action[,]" because "the APA's waiver of sovereign immunity does not extend to damages claims," *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 34 (D.D.C. 2020) (citing 5 U.S.C. § 702). But the federal government *has* waived its sovereign immunity with respect to certain damages suits in the Court of Federal

Claims through the Tucker Act, 28 U.S.C. § 1491, and the Indian Tucker Act, 28 U.S.C. § 1505. *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003). And, as the DOI points out, Plaintiffs here have already instituted an action against the United States in the Court of Federal Claims, in which they seek a money judgment against the federal government on several grounds, including that the Bureau violated the FBMLA and breached its fiduciary duties to Plaintiffs by approving the Oil and Gas Lease and by failing to pay the proceeds of the lease to Plaintiffs. *See* Am. Compl. ¶¶ 45–46, 56–57, *Fredericks v. United States*, No. 14-cv-296 (Fed. Cl. July 10, 2015), ECF No. 24; *see also Fredericks*, 125 Fed. Cl. at 410.[22]

It is clear to this Court that Plaintiffs' pending efforts to recover the mineral lease proceeds in the context of a legal action that Plaintiffs have brought against the United States in the Court of Federal Claims undermines their simultaneous assertion here that such proceeds are essentially unrecoverable such that a preliminary injunction is needed. The gravamen of Plaintiffs' APA claims challenging the Board's decision is that Plaintiffs (and *not* Judy) are entitled to receive all proceeds from the Oil and Gas Lease (*see* Pls.' Mot. at 18), and the claimed irreparable injury that allegedly justifies a preliminary injunction is that, during the pendency of this lawsuit, the Department will distribute those lease proceeds to Judy instead (*see id.* at 20). However, insofar as Plaintiffs have undertaken to claim those very same proceeds in another legal action, they have already apparently determined that the alleged harm *can* be remedied, if not by this Court, then by the Court of Federal Claims. In this Court's view, Plaintiffs cannot have it both ways: if their position is that a remedy presently exists to

---

[22] The Court of Federal Claims case is currently stayed pending resolution of the instant action. *See* Order, *Fredericks v. United States*, No. 14-cv-296 (Fed. Cl. Oct. 20, 2020), ECF No. 91.

compensate them for any lease proceeds that are allegedly erroneously distributed to Judy, then they cannot simultaneously insist that distribution to Judy will subject them to irreparable harm. *Cf. Wisc. Gas Co.*, 758 F.2d at 674 (explaining that a party seeking injunctive relief must "substantiate the claim that irreparable injury is 'likely' to occur").

Notably, the mere fact that the government has not *conceded* that Plaintiffs are entitled to recover the distributed lease proceeds in the context of the Court of Federal Claims case (*see* Pls.' Reply at 19) is not dispositive of this Court's determination of whether Plaintiffs will be irreparably harmed absent injunctive relief. It suffices that the DOI acknowledges that sovereign immunity has been waived for claims for money damages such as those that Plaintiffs have brought in the Court of Federal Claims (*cf.* Defs.' Opp'n at 20), which means there is consensus that a potential avenue exists for Plaintiffs to obtain relief at the conclusion of the instant case if this Court enters judgment in Plaintiffs' favor, *see Wisc. Gas Co.*, 758 F.2d at 675 (concluding that petitioners failed to show irreparable injury where there were "several possible means by which the petitioners could recover" certain payments); *compare, e.g., Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 59 (D.D.C. 2020) (finding irreparable harm where defendants had not "suggested any waiver of sovereign immunity that might enable recovery of monetary damages from" defendant federal agency).

Moreover, a preliminary inquiry into the likelihood that Plaintiffs would actually recover such proceeds if it is determined that the DOI has unlawfully distributed proceeds from the Oil and Gas Lease to Judy—a practice that other courts in this

jurisdiction have undertaken in similar circumstances, *see, e.g.*, *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 104 F. Supp. 2d 58, 76 (D.D.C. 2000) (finding irreparable harm where there was a "substantial risk" that plaintiffs would be unable to recoup back pay under the Back Pay Act); *Clarke*, 355 F. Supp. 2d at 66 (similar)— indicates that Plaintiffs are likely to prevail in their Court of Federal Claims action if this Court ultimately rules in their favor on their APA claims here.  In particular, and importantly, it is well established that "[n]either the Tucker Act nor the Indian Tucker Act creates substantive rights; they are simply jurisdictional provisions that operate to waive sovereign immunity for claims premised on other sources of law[,]" such as "statutes or contracts[.]"  *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009).  Thus, to prevail on a damages claim against the United States in the Court of Federal Claims under the Tucker Act or the Indian Tucker Act, a plaintiff must (1) "identify a substantive source of law that establishes specific fiduciary or other duties," (2) demonstrate that "the Government has failed faithfully to perform those duties[,]" and (3) establish that "the relevant source of substantive law can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties the governing law imposes."  *Inter-Tribal Council of Ariz., Inc. v. United States*, 956 F.3d 1328, 1338 (Fed. Cir. 2020) (quoting *Navajo Nation*, 556 U.S. at 290–91); *see also White Mountain Apache Tribe*, 537 U.S. at 472 (observing that "a statute creates a right capable of grounding a claim within the waiver of sovereign immunity" under the Tucker Act and the Indian Tucker Act "if, but only if, it can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained" (internal quotation marks and citation omitted)).  And, in this Court's view, Plaintiffs'

FBMLA claims in the Court of Federal Claims easily clear all three of these hurdles, assuming that Plaintiffs ultimately succeed on the merits in the instant action, based on the following preliminary analysis.

It is reasonably clear that the FBMLA's requirement that the Secretary determine that approving a lease is in the best interest of the owners, *see* FBMLA § 1(a)(2)(A)(ii), imposes a "specific obligation" and "detail[s] comprehensive responsibilities of the Federal Government in managing" mineral leasing on the Fort Berthold Reservation, *Hopi Tribe v. United States*, 782 F.3d 662, 667 (Fed. Cir. 2015) (internal quotation marks and citations omitted). Indeed, when the Supreme Court has considered similar statutes, including provisions "mandat[ing] that sales of timber from Indian trust lands be based upon the Secretary's consideration of 'the needs and best interests of the Indian owner and his heirs' and that proceeds from such sales be paid to owners 'or disposed of for their benefit[,]'" *United States v. Mitchell*, 463 U.S. 206, 224 (1983) ("*Mitchell II*") (quoting 25 U.S.C. § 406(a)), it has concluded that those provisions "clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources" sufficient to ground jurisdiction under the Tucker Act and the Indian Tucker Act, *id.* at 226; *compare, e.g.*, *United States v. Mitchell*, 445 U.S. 535, 546 (1980) ("*Mitchell I*") (holding that a statute that merely allotted lands and provided that the federal government would retain those lands in trust "cannot be read as establishing that the United States has a fiduciary responsibility for management of allotted forest lands").

If the FBMLA is thus interpreted to impose a duty on the DOI to distribute all proceeds under the Oil and Gas Lease to Plaintiffs rather than Judy, the DOI would

breach that duty if it distributed lease proceeds to Judy instead. *Cf. Inter-Tribal Council*, 956 F.3d at 1342–43. Moreover, the relevant FBMLA provisions can fairly be interpreted as money-mandating, as necessary to satisfy the final requirement for a viable claim under the Tucker Act and the Indian Tucker Act, because the Supreme Court has "consistently recognized that the existence of a trust relationship between the United States and an Indian or Indian tribe includes as a fundamental incident the right of an injured beneficiary to sue the trustee for damages resulting from a breach of the trust." *Mitchell II*, 463 U.S. at 226; *see also, e.g.*, *White Mountain Apache Tribe*, 537 U.S. at 475–76. Thus, it would appear that, if Plaintiffs are successful in their bid to convince this Court that the DOI has unlawfully earmarked the Oil and Gas Lease proceeds for distribution to Judy, then they would likewise be entitled to recover those proceeds in the form of money damages in the context of their pending action in the Court of Federal Claims.

The fact that the Court of Federal Claims has already denied in part and deferred in part a motion to dismiss that the United States filed in Plaintiffs' action in that court, *Fredericks*, 125 Fed. Cl. at 422, is consistent with this Court's preliminary analysis, and that court's reasoning suggests that Plaintiffs will prevail in that forum if they are successful with respect to their APA claims in the instant matter, *see id.* at 411–12.[23]

---

[23] The Court of Federal Claims has already concluded, as a threshold matter, that the Tucker Act and the Indian Tucker Act provide subject-matter jurisdiction over Plaintiffs' claims, explaining that, "[g]iven the government's statutory and regulatory responsibility for granting and approving leases and monitoring adherence to and performance of leases, . . . the statutes and regulations at issue in this case[,]" including the FBMLA, "impose fiduciary duties upon the government that are money-mandating in redressing a breach." *Fredericks*, 125 Fed. Cl. at 411. The court has also rejected the government's contention that Plaintiffs "lack standing to assert breach of trust claims arising prior to [the Bureau's] 2013 final probate order" because Plaintiffs "did not have a 'legally protected interest' in their deceased father's assets" until the probate order "vested [them] with property rights[.]" *Id.* at 412.

And given that the government's argument in the Court of Federal Claims is essentially identical to the DOI's position in the instant matter (*compare* Defs.' Opp'n at 26–27), it is difficult to see how the Court of Federal Claims would not also be compelled to decide this issue in favor of Plaintiffs, if this Court ultimately rejects the DOI's position and rules in favor of Plaintiffs on the merits.

To be sure, this Court's conclusions in the context of the instant APA action are by no means preclusive of the outcome in the pending Court of Federal Claims case; thus, the government may well attempt to raise other merits defenses in the Court of Federal Claims, even if Plaintiffs eventually prevail on their APA action in this Court. But, as best as this Court can discern, at least preliminarily, this Court's disposition of the instant matter would likewise resolve the damages claims Plaintiffs have brought in their Court of Federal Claims lawsuit.[24] Consequently, this Court sees no "substantial risk[,]" *see Am. Fed'n of Gov't Emps.*, 104 F. Supp. 2d at 76, that any lease proceeds to which Plaintiffs may be entitled will be unrecoverable, and it therefore finds that Plaintiffs have not met the "high standard for irreparable injury[,]" *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297, so as to demonstrate entitlement to a preliminary injunction.[25]

---

[24] Plaintiffs' effort to avoid this conclusion by characterizing their alleged injuries as something other than the loss of the distributed lease proceeds—*i.e.*, as an "unauthorized interference with a real property interest[,]" and as a breach of the DOI's "statutory trust duties"—is likewise unavailing. (Pls.' Mot. at 21 (internal quotation marks and citations omitted).) As to the former framing, Plaintiffs assert that "the legal remedy is assumed to be inadequate" when "land is the subject matter of the agreement," because "each parcel of land is unique." (*Id.* at 20 (internal quotation marks and citations omitted).) But that principle has no application here, because Plaintiffs do not ground their claimed injury in any "unique" characteristics of the 160-acre parcel covered by the Oil and Gas Lease; instead, they are merely seeking to appropriate for themselves the income derived from that land. And as to the latter characterization, this Court has already determined that the DOI's actions likely do not constitute a breach of its trust obligations. *See supra* Part III.A.2.

[25] Because the Court finds that Plaintiffs are sufficiently likely to recover in the Court of Federal Claims if they prevail on the merits in the instant litigation, the Court need not address whether

47

### C. The Balance Of Equities And The Public Interest Do Not Favor Issuance Of A Preliminary Injunction

The last two preliminary-injunction factors—the balance of equities and the public interest—effectively "merge when the Government is the opposing party" against whom injunctive relief is sought, because the government's "harm and the public interest are one and the same[.]" *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Accordingly, "[w]hen a private party seeks injunctive relief against the government, the final two injunction factors . . . generally call for weighing the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined." *Doe v. Mattis*, 928 F.3d 1, 23 (D.C. Cir. 2019).

Under the circumstances presented here, the Court finds that the balance of the equities weighs against issuance of a preliminary injunction, because, on balance, the harm to Judy resulting from issuance of a preliminary injunction outweighs the potential harm to Plaintiffs in the absence of preliminary relief. *See League of Women Voters*, 838 F.3d at 12 (explaining that the balance-of-equities factor also requires courts to consider whether the requested preliminary injunction will "substantially injure other interested parties" (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297)). According to the Department, Judy is 77 years old (*see* Hr'g Tr. at 86:3–5), and aside from an apparently relatively brief period in which the Bureau "began distributing the proceeds from the Oil Lease to Judy" (Fredericks Decl. ¶ 17), she has been unable to benefit from her inheritance since her husband passed away in 2006, *see*

---

Plaintiffs may also have a cause of action against Judy to recover any of their alleged losses. (*See* Defs.' Opp'n at 20; Pls.' Reply at 18–19.)

*Probate Decision*, 57 IBIA at 205–06. By contrast, regardless of how the lease proceeds that have accrued to date are distributed, Plaintiffs will be "entitled to receive any Lease income that accrues after Judy's death." *Board Decision*, 67 IBIA at 132. This at least somewhat mitigates the harm to Plaintiffs if lease income is erroneously distributed to Judy pending the Court's resolution of the instant legal action.

The Court is mindful that it has taken eight years for this dispute to reach this Court, and that delay is partly attributable to the Department. (*See* Pls.' Mot. at 23.) *See also Board Decision*, 67 IBIA at 140 n.19 (noting that the Board denied the Regional Director's request to "expedite its consideration of this appeal"). And it also recognizes that the Department at one point suggested that the lease proceeds would not be distributed to Judy until "the exhaustion of all administrative and judicial proceedings." (Pls.' Mot. at 23 (quoting Regional Director Decision at 5).) But Judy's advanced age and undisputed life tenancy suggest that the harms of enjoining distribution outweigh the benefits (*i.e.*, the preservation of the lease proceeds for the benefit of the remaindermen, who would not be entitled to such funds under probate law until Judy's death in any event).

It is also clear to this Court that the DOI has the stronger argument on the merits. *See Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 83 (D.D.C. 2013) (observing that, when "the parties' public interest arguments are essentially derivative of the parties' arguments on the merits of the case, it follows that the public interest factor of the preliminary injunction test should weigh in favor of whoever has the stronger arguments on the merits"), *aff'd*, 746 F.3d 1065 (D.C. Cir. 2014), *aff'd on reh'g en banc*, 760 F.3d 18 (D.C. Cir. 2014). (*See also* Pls.' Mot. at 23–24; Defs.'

Opp'n at 34.)  As discussed at length above, the DOI is likely correct that the Superintendent's execution of the Oil and Gas Lease and the distribution of all lease proceeds to Judy during her lifetime are entirely proper under the applicable statutes and regulations.  *See supra* Part III.A.  Moreover, it is well established that "[i]t is in the public interest to deny injunctive relief when the relief is not likely deserved under law."  *Hubbard v. United States*, 496 F. Supp. 2d 194, 203 (D.D.C. 2007) (internal quotation marks and citation omitted).  Indeed, as this Court has already explained, Congress enacted the FBMLA to "facilitate the leasing of mineral rights within" the Fort Berthold Reservation, S. Rep. No. 105-205, at 1, and to ensure that Indian landowners "gain maximum economic benefit from their ownership[,]" *id.* at 11 (statement of Edward B. Cohen, Deputy Solicitor, Dep't of Interior).  And this Court concludes that those congressional purposes would be undermined if litigants could forestall the lawful distribution of lease proceeds by obtaining a preliminary injunction in federal court.

## IV. CONCLUSION

As explained above, Plaintiffs have not established a likelihood of success on the merits of their APA claims, and have not demonstrated that they would be irreparably harmed in the absence of the preliminary injunction they seek.  Moreover, the balance of the equities and the public interest weigh against issuance of a preliminary injunction.  Thus, as set forth in the accompanying Order, Plaintiffs' motion for a preliminary injunction (ECF No. 4) will be **DENIED**.

DATE:  July 1, 2021

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States Circuit Judge
*Sitting by Designation*